**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**KENNETH ROBERT LAFFERTY, JR.,**

               Plaintiff,

**v.**

        **CIVIL ACTION NO.: 1:16-CV-15
(KEELEY)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

               Defendant.

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On February 2, 2016, Plaintiff Kenneth Robert Lafferty, Jr. ("Plaintiff"), through counsel Brian D. Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On April 5, 2016, Defendant, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On April 15, 2016, and May 12, 2016, Plaintiff and Defendant filed their respective Motions for Summary Judgment and supporting briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 12). On May 20, 2016, Plaintiff filed a Response to Defendant's supporting brief. (Pl.'s Resp. to Def.'s Br. in Supp. of her Mot. for Summ. J. ("Pl.'s Resp."), ECF No. 14). The matter is now before the undersigned United States

Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II.  PROCEDURAL HISTORY

On October 11, 2012, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB"), alleging disability that began on October 8, 2012. (R. 17, 151). Because Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through December 31, 2015, Plaintiff must establish disability on or before this date. (R. 17). Plaintiff's claim was initially denied on February 6, 2013, and denied again upon reconsideration on March 7, 2013. (R. 96, 102). After these denials, Plaintiff filed a written request for a hearing. (R. 105).

On September 17, 2014, a hearing was held before United States Administrative Law Judge ("ALJ") George A. Mills, III, in Morgantown, West Virginia. (R. 17, 32, 120). Plaintiff, represented by counsel Brian D. Bailey, Esq., appeared and testified at the hearing. (R. 17, 32). Larry A. Bell, an impartial vocational expert, testified via telephone. (R. 17, 32, 36, 119, 141). On October 14, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 14). On January 11, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.    BACKGROUND

### A.    Personal History

Plaintiff was born on August 30, 1980, and was thirty-two years old at the time he filed his claim for DIB. (See R. 79). He is 6'2" tall and weighs approximately 250 pounds. (R. 42, 169). He is single and lives in a toolshed on his parents' property. (R. 60). He has completed high school and attended one year of college. (R. 170). He has also completed specialized job training. (Id.). Specifically, he completed a "Youth Service Worker Program" in August of 2011. (Id.). His prior work experience includes working as a youth service worker, car detailer, fast food worker and telemarketer. (R. 73). He alleges that he is unable to work due to the follow ailments: (1) lower back/hip impairments; (2) arthritis in both hips, caused by prior surgeries in which pins were inserted into his hips and (3) lower back pain caused by a "leg length discrepancy." (R. 169).

### B.    Medical History

#### 1.    Medical History Post-Dating Alleged Onset Date of October 8, 2012[1]

On January 30, 2013, Plaintiff presented to Fairmont Clinic Family Practice, where he received primary care, for a disability examination.[2] (R. 220-21). Himanshu Paliwal, M.D., a general practitioner, performed the disability examination, which consisted of an interview and physical evaluation of Plaintiff. (R. 221). During the interview, Dr. Paliwal documented that Plaintiff's chief complaints consist of low back and hip pain. (R. 220). After inquiring into Plaintiff's medical history, Dr. Paliwal

_____

[1] Plaintiff did not submit any medical records pre-dating his alleged onset date.
[2] The findings from this examination are not discussed in the Medical Reports/Opinions of the Report & Recommendation because the findings are discussed in a treatment note and are not addressed to the Social Security Administration or written on an agency-provided form. Moreover, the findings do not appear to contain any actual opinion.

documented that Plaintiff underwent bilateral hip dysplasia surgery at the age of fourteen years, during which pins were inserted into Plaintiff's hips. (Id.). Dr. Paliwal noted that Plaintiff has experienced bilateral hip pain since his surgery and that his back pain developed at the age of eighteen years. (Id.). However, Dr. Paliwal also noted that Plaintiff had not sought treatment for his symptoms, documenting that:

> He was just seen once at ER when he was 18. [S]ince then he never had x ray/physical therapy/orthopaedic consultation. He does not have insurance so he never goes to any doctor.

(Id.). Finally, Dr. Paliwal noted that Plaintiff lives alone in the woods and that "his family helps him." (Id.).

After the interview, Dr. Paliwal performed a physical evaluation of Plaintiff. After this evaluation, Dr. Paliwal documented that Plaintiff suffered from bilateral paraspinal diffuse tenderness but that, despite this tenderness, he "was comfortable during [the] whole evaluation," including when getting on and off the examination table, and that he could walk normally without an assistive device. (Id.). Dr. Paliwal also documented that Plaintiff's range of motion was normal for his age and body habits, including the range of motion of his hips and spine. (R. 218-19). After the disability examination, Dr. Paliwal ordered X-rays of Plaintiff's lumbosacral spine, which were normal. (R. 221-22). Therefore, Dr. Paliwal assessed Plaintiff as having low back and hip pain. (R. 221).

On March 12, 2013, Plaintiff presented to the emergency department at United Hospital Center, complaining of exacerbation of his chronic right hip pain. (R. 226). X-rays of Plaintiff's right hip were ordered which revealed:

> Dysmorphism of the right femur is likely chronic change. There is postoperative change in both hips. . . . No acute bony abnormality is identified.

(R. 224). Ultimately, Plaintiff was diagnosed with chronic right hip pain and prescribed Ultram and a high dose of ibuprofen for his pain. (R. 228-29).

On November 5, 2013, Plaintiff returned to United Hospital Center's emergency department, stating that he "was having thoughts to cut [his] wrist." (R. 255). Plaintiff further stated that he was "hearing voices . . . [and] seeing visions" and that he was becoming "overwhelmed with these episodes of auditory and visual hallucinations." (Id.). When asked about his living conditions, Plaintiff stated that he was living in a van on his family's property and that, for the past week, he had stayed in the van and not showered, eaten or slept. (Id.). Finally, Plaintiff stated that he uses marijuana once every two weeks. (Id.). Due to Plaintiff's statements, Plaintiff was diagnosed with marijuana abuse/dependence, bipolar disorder with psychotic features and a substance-induced mood disorder. (R. 232). His Global Assessment of Functioning ("GAF") score, or assessment of his mental functioning, was rated at "25 to 30" on a scale of 1 to 100, 100 representing superior functioning. (R. 256). Plaintiff agreed to voluntary hospitalization, during which he was started on a trial period of Latuda, an antipsychotic medication, and received individual and group psychotherapy. (R. 232, 256). On November 11, 2013, when his mood had stabilized and when he denied suicidal thoughts, Plaintiff was discharged home "with rehabilitation services in place." (R. 232).

On March 20, 2014, Plaintiff presented to the Community Mental Health Center. (R. 272). During this visit, Plaintiff was diagnosed with "[m]oderate – [m]ajor depressive disorder, recurrent" and his GAF score was determined to be "51-60." (Id.). His chart indicated that he was prescribed Seroquel, an antipsychotic medication, for his depression. (Id.). His chart also indicated:

> [Plaintiff] states [Seroquel] has helped [him] . . . . He is not having as much paranoia or hallucinations. Sleep is better, but not 7-8 hours consistently at night. He does not feel meds need increased . . . just yet.

(Id.).

On or about April 17, 2014, Plaintiff cancelled a scheduled appointment at the Community Mental Health Center. (R. 269). At this time, his chart indicated that his diagnoses had been changed to schizoaffective disorder and an anxiety disorder and that he was still taking Seroquel. (Id.).

On June 5, 2014, Plaintiff presented to a West Virginia University ("WVU") Healthcare clinic in Morgantown, West Virginia, after being referred by Joseph Snead, M.D., of Weston Orthopaedic and Sports Medicine. (R. 275-76). Adam Klein, M.D., evaluated Plaintiff during this appointment. (Id.). During the evaluation, Plaintiff stated that he had suffered from bilateral hip pain since his childhood hip surgery but that his "pain has significantly worsened over the last [six] years." (R. 276). Plaintiff further stated that the pain is more severe in his right hip than in his left. (Id.). X-rays of Plaintiff's hips were ordered, which revealed "the presence of a severely arthritic right hip with significant femoral head flattening and neck shortening from the prior . . . pinning . . . [and] degenerative changes . . . [in] the left hip." (R. 277). Additionally, X-rays of Plaintiff's lumbar spine were ordered, which revealed significant degenerative disc disease. (Id.).

After a review of the X-rays and an examination, Plaintiff was diagnosed with, *inter alia*: (1) advanced right hip degenerative joint disease; (2) a history of slipped capital femoral epiphyses in both hips, status post pinning twenty years ago, and (3) severe degenerative disc disease of the lumbar spine. (Id.). Plaintiff was informed that

"hip replacement surgery is inevitable"[3] and that he would require multiple revision surgeries throughout his lifetime. (Id.). Nevertheless, Plaintiff stated that, "[a]lthough he [wa]s in pain and ha[d] limitations, he d[id] not feel that he [wa]s quite at the point to proceed with [a hip replacement] surgery." (Id.). Therefore, it was documented that Plaintiff would "continue to manage his pain conservatively" and schedule a hip replacement surgery when desired. (Id.).

On July 1, 2014, Plaintiff presented to the Community Mental Health Center for a routine appointment. (R. 280). During this appointment, Plaintiff stated that no longer lived in a van but was "living in a building on his parents['] property." (Id.). Plaintiff also complained of, *inter alia*, severe symptoms of an undisclosed phobia and moderate symptoms of depression. (Id.). After an evaluation, Plaintiff's diagnoses of schizoaffective disorder and of an anxiety disorder remained unchanged. (R. 282-83). His GAF score also remained at "51-60." (Id.). To treat his symptoms, Plaintiff's chart reflected that supportive counseling and targeted case management were recommended and that Plaintiff "will be receiving high end services." (R. 283).

### 2. Medical Reports/Opinions

#### a. Disability Determination Explanation by Porfirio Pascasio, M.D., February 5, 2013

On February 5, 2013, Porfirio Pascasio, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 79-85). Prior to drafting the Initial Explanation, Dr. Pascasio reviewed, *inter alia*, Plaintiff's medical records, treatment notes and Adult Function Report. (R. 80).

---

[3] On a form entitled Claimant's Recent Medical Treatment, dated March 19, 2014, Plaintiff reported that he was told he would require a hip replacement "in the near future." (R. 202).

After reviewing these documents, Dr. Pascasio concluded that Plaintiff suffers severe "Other and Unspecified Arthropathies." (R. 81).

In the Initial Explanation, Dr. Pascasio completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 82-83). During this assessment, Dr. Pascasio found that, while Plaintiff possesses no postural, manipulative, visual, communicative or environmental limitations, he possesses exertional limitations. (R. 82). Regarding his exertional limitations, Dr. Pascasio found that Plaintiff is able to: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (Id.). After completing the RFC assessment, Dr. Pascasio determined that Plaintiff is able to perform medium-level exertional work. (R. 84).

Also in the Initial Explanation, Joseph A. Shaver, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form. (R. 81). On this form, Dr. Shaver opined that Plaintiff does not suffer from a medically determinable mental impairment. (Id.).

### b. Disability Determination Explanation by Curtis Withrow, M.D., March 1, 2013

On March 1, 2013, Curtis Withrow, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 87-94). Prior to drafting the Reconsideration Explanation, Dr. Withrow reviewed the same documents that Dr. Pascasio had reviewed when drafting the Initial Explanation, in addition to Plaintiff's updated medical records.

(R. 88). After reviewing these documents, Dr. Withrow affirmed Dr. Pascasio's conclusions contained in the Initial Explanation. (R. 89-93).

Also in the Reconsideration Explanation, Jim Capage, Ph.D., a state agency psychologist, reviewed Dr. Shaver's Psychiatric Review Technique form from the Initial Explanation. (R. 90). After reviewing the form, Dr. Capage affirmed Dr. Shaver's conclusion that Plaintiff does not suffer from a medically determinable mental impairment. (Id.).

### c. Psychological Examination by Rod McCullough, M.A., July and August 2014

On September 11, 2014, Rod McCullough, M.A., a licensed psychologist, drafted a letter to Plaintiff's counsel, Mr. Bailey, detailing his Psychological Examination of Plaintiff. (R. 289-92). In this letter, Mr. McCullough explained that he had reviewed Plaintiff's medical records and had met with and interviewed Plaintiff on July 11, 2014, and on August 14, 2014. (R. 289). Mr. McCullough explained that, in his first meeting with Plaintiff, Plaintiff discussed his "chaotic childhood" and how his father physically abused him. (R. 290). Mr. McCullough further explained that Plaintiff labeled his current relationship with his parents as "poor" and that "he finds himself worrying that he may hurt them in some fashion." (Id.). Finally, Mr. McCullough explained that, in his second meeting with Plaintiff, Plaintiff reported that he had voluntarily hospitalized himself at the age of eighteen or nineteen years due to suicidal thoughts, caused by the stress of "living on the streets staying from place to place." (Id.).

In addition to interviewing Plaintiff, Mr. McCullough performed a psychological evaluation of Plaintiff over the course of their two meetings. Specifically, Mr. McCullough administered the Millon Clinical Multiaxial Inventory ("MCMI-III") test to

Plaintiff, which is used to assess emotional and behavioral disturbances. (R. 290). After administering the MCMI-III test, Mr. McCullough documented that Plaintiff appears to suffer from "a mild to moderate degree of emotional distress" and that his "overall profile suggests strong characterological dysfunction[,] which most closely resembles that of a Schizotypal Personality Disorder." (R. 291).

At the conclusion of the Psychological Evaluation, Mr. McCullough concluded that Plaintiff suffers from schizoaffective disorder, depressed type, and possible post-traumatic stress disorder. (Id.). Mr. McCullough further concluded that:

> [I]t is quite likely that the stress of sustaining employment, even in a low stress, low productivity quote job[ ] will not only increase his delusional and hallucinatory symptoms but will most likely le[ad] to a period of significant decompensation. . . .

(Id.). Finally, Mr. McCullough concluded that Plaintiff's prognosis is poor and that he "[clearly] will not be rehabilitated to a higher level of functioning within the next year." (Id.).

## C.    Testimonial Evidence

During the administrative hearing on September 17, 2014, Plaintiff discussed his relevant personal facts and work history.[4] Plaintiff is homeless. (R. 60). Previously, he lived in a van on his parents' property although he currently lives in his parents' toolshed. (Id.). He ceased attending public school in the seventh grade but was home-schooled for the next three to four years, reaching a ninth grade level. (R. 44-45). He received his GED in 1998. (R. 44). His past work includes working as a caretaker for adults with mental impairments, dishwasher at Shoney's restaurant, telemarketer for various companies and automobile detailer for Magic Touch. (R. 48-51). Most recently,

---

[4] Plaintiff further discusses his work history on his Claimant's Work Background form, dated March 19, 2014. (See R. 201).

he worked as a youth service worker for Youth Academy, where he supervised teenagers and ensured that they participated in scheduled activities. (R. 46-47).

Plaintiff testified that he suffers from physical ailments, including bilateral hip impairments. (R. 56). Due to Plaintiff's hip impairments, his left leg is approximately one inch longer than his right leg, which causes him to suffer from back pain. (R. 53) (explaining that Plaintiff's back pain stems from his hip impairments and that he does not suffer from a "separate back [impairment]"). Plaintiff underwent bilateral hip surgeries when he was fourteen years of age. (Id.). He is not prescribed any pain medication because he was told he "need[s] to wait until the pain gets so bad [that he requires] . . . a hip implant." (R. 54). Instead, he takes over-the-counter ibuprofen for his pain and applies heat and coldness as needed. (R. 56). He states that activity aggravates his pain and that if he talks too much or stays in the same position for too long his hips "lock[ ] up . . . and [he is] unable to move." (R. 56, 65). He further states that laying flat on his back relieves his pain and that he lays down about ten times a day for one hour. (R. 56, 64-65).

Plaintiff testified regarding the limitations that his hip impairments cause. Due to his impairments, he is limited to walking the length of one city block. (R. 57). He is able to stand in place for only three minutes, remain sitting for thirty minutes and bend over for "a second or two." (Id.). He is able to lift and carry only ten pounds. (Id.). He is unable to squat and experiences difficulty bathing his legs and feet. (R. 59). While he is able to operate a motor vehicle, he only drives when "[he] absolutely [has] to" and then limits himself to driving no farther than ten to fifteen miles due to his pain. (R. 43). He also experiences difficulty sleeping at night due to his pain. (R. 59).

In addition to physical impairments, Plaintiff testified that he suffers from mental impairments. Plaintiff describes his childhood as difficult and states that his parents yelled at him, "beat [him] up a lot" and exposed to "hardcore pornography." (R. 67). As a result, Plaintiff has felt depressed since he "was a pretty young kid." (R. 55). When he is stressed, he experiences hallucinations. (R. 68). For example he sees "bugs flying around" or "the walls kind of melting." (Id.). Prior to his hearing, he hallucinated "every night for a couple of weeks." (Id.). He has been hospitalized for psychiatric problems twice in his lifetime. (R. 67). In early 2014, he began receiving mental health treatment at the Community Mental Health Center. (R. 53, 58). To treat his mental impairments, Plaintiff is prescribed Seroquel. (R. 54). He also periodically uses marijuana to "help[ ] . . . with [his] depression," although he has not used it in about a year. (R. 54-55).

Finally, Plaintiff testified regarding his routine activities. On a typical day, Plaintiff awakens at 10:00 A.M. or 11:00 A.M. (R. 60). He then spends the majority of his day laying on his back and watching television. (R. 62). Occasionally, he washes his laundry and shops for groceries with his mother. (Id.).

**D.    Vocational Evidence**

**1.  Vocational Testimony**

Larry Bell, an impartial vocational expert, also testified during the administrative hearing. (R. 72-77). Initially, Mr. Bell testified regarding the characteristics of Plaintiff's past relevant work. (R. 73). Regarding Plaintiff's most recent job as a youth service worker, Mr. Bell characterized the position as a light exertional and semi-skilled position. (Id.). Regarding Plaintiff's previous jobs, Mr. Bell characterized Plaintiff's work in

detailing cars, as a fast food worker and as a telemarketer as light and unskilled, light

and unskilled and sedentary and semi-skilled, respectively. (Id.).

After Mr. Bell described Plaintiff's past relevant work, the ALJ presented several

hypothetical questions for Mr. Bell's consideration. In the first hypothetical question, the

ALJ asked:

> [Assume a hypothetical individual who is] a younger individual under the
> regulations and of course, I'm just going to say a high school equivalent
> education. . . . And of course the work that you described. . . . [A] medium
> exertional level of work. Medium is lifting 50 pounds occasionally, 25
> pounds frequently. Standing and walking six to eight hours, sitting six to
> eight hours, with normal breaks. And this was as of March, 2013.
>
> A person limited to light work or medium work would be able to do the work that
> [Plaintiff] did in the past, is that correct?

(Id.). In response to the hypothetical, Mr. Bell testified that such an individual could

perform Plaintiff's past work. (Id.). The ALJ then asked:

> Secondly, consider the light exertional level. Light is lifting 20 pounds
> occasionally, 10 pounds frequently. Standing and walking six to eight
> hours a day, sitting six to eight hours a day, with normal breaks. Consider
> no climbing of any ladders, ropes or scaffolds. Consider only occasionally
> climb ramps and stairs, or balance, stoop, crouch. No kneeling, no
> crawling. On the environmental considerations avoid concentrated
> exposure to temperature extremes, vibration and hazards. And by hazards
> I mean working around moving plant machinery or any unprotected
> heights.
>
> Looking at the work that [Plaintiff] did in the past, would that hypothetical
> preclude an individual from doing [Plaintiff's] work if they were limited in
> the manner that I indicated?

(R. 73-74). Mr. Bell responded that the individual would be able to perform Plaintiff's

past work in detailing cars and as a telemarketer. (R. 74). The ALJ then asked, using

the same hypothetical, whether the individual would be able to perform other work, to

which Mr. Bell responded that the individual would be able to work as an office helper or

a garment sorter and marker. (R. 74-75). The ALJ asked whether these jobs would be available if the individual was limited to simple, routine and unskilled work, to which Mr. Bell responded in the affirmative. (R. 75).

Plaintiff's counsel, Mr. Bailey, also presented questions for Mr. Bell's consideration during the administrative hearing. (R. 76-77). First, Mr. Bailey asked how an individual's employment opportunities would be affected if the individual "could not sustain even simple, routine, repetitive work." (R. 76). Mr. Bell opined that such an individual would not be employable. (Id.). Second, Mr. Bailey asked how an individual's employment opportunities would be affected if the individual were absent or off task "[ten] percent of the time [or more]," to which Mr. Bell opined that such an employee would not be employable. (Id.). Third, Mr. Bailey asked whether laying down is considered being off task, to which Mr. Bell responded in the affirmative. (R. 77). After the ALJ's and Mr. Bailey's questions, Mr. Bell declared that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (R. 76-77).

## 2. Disability Reports

On October 12, 2012, Plaintiff submitted a Disability Report. (R. 168-74). In this report, Plaintiff indicated that he is unable to work due to the following ailments: (1) a lower back impairment; (2) arthritis in both hips, stemming from an "old surgery" in which pins were placed in his hips and (3) a "leg length discrepancy." (R. 169). Plaintiff further indicated that he stopped working on October 8, 2012, "[b]ecause of [his] condition(s)" but that his conditions caused him "to make changes in [his] work activity" for the year prior to his quit date. (Id.). Finally, Plaintiff indicated that he was receiving treatment for physical conditions but not for any mental conditions. (R. 172).

Plaintiff submitted two Disability Report-Appeal forms. (R. 188-00). On February 12, 2013, Plaintiff documented that he had not experienced any changes in his conditions since filing his Disability Report. (R. 188-91). On April 4, 2013, Plaintiff documented that, while he still had not experienced any changes in his conditions, he had received additional medical care since his last report. (R. 195-97).

## E.    Lifestyle Evidence

On October 28, 2012, Plaintiff submitted an Adult Function Report. (R. 175-85). In this report, Plaintiff states that he is unable to work because:

> I am unable to rise from a sleeping position to standing to get ready for work within a set time. Late to work. I am unable to stand or sit for extended times and I have to lay down throughout the day. I have trouble reaching things below my waist.

(R. 175).

Plaintiff discloses that he is limited in some ways but not in others. In several activities, Plaintiff requires no or minimal assistance. For example, Plaintiff is able to perform his own personal care, although he experiences some difficulty while doing so. (R. 179). He is able to perform household chores such as washing laundry, sweeping and cleaning countertops, although he "never do[es] these" because he is homeless. (R. 175, 180). He is able to travel without accompaniment by walking, riding in a car and using public transportation. (R. 181-82). He is able to shop in stores, pay bills, count change, handle a savings account and use a checkbook/money orders. (R. 181). He is able to engage in hobbies, which include reading and photography, which he does "often." (R. 182). While he does not get along with authority figures,[5] he is able to socialize with others and enjoys sitting around a camp fire and conversing with others.

---

[5] Plaintiff explains that he "can't complete anything or follow a bosses [sic] directions without complaining." (R. 183).

(R. 182, 184). Finally, he is able to follow written and spoken instructions and handle stress and changes to his routine. (R. 183-84).

While Plaintiff is able to perform some activities, he described how others prove more difficult due to his back and hip impairments. Plaintiff's impairments affect his ability to, *inter alia*: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks and concentrate. (R. 183). He requires a "1 inch wedge in [his] right shoe" to walk and occasionally requires a cane.[6] (R. 184). He is only able to walk a quarter of a mile before needing to stop and rest for "maybe [ten] min[utes], maybe several hours." (R. 183). He is unable to "stay in any body position for long." (Id.). Due to his back and hip pain, he suffers from an inability to concentrate and difficulty sleeping. (R. 179, 183).

Finally, Plaintiff details his routine activities.[7] On a typical day, Plaintiff wakes up and "tr[ies] to get to a [seated] position [so he can] eventually stand." (R. 179). He then alternates between standing, sitting and laying down throughout the day to avoid pain. (Id.). He goes shopping for food and necessities "every couple of days." (R. 181). He goes to the library "on a regular basis." (R. 182).

## IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

---

[6] The cane is not prescribed by a physician. (R. 55-56).

[7] In his Adult Function Report, Plaintiff reported that he did not take any medications on a daily basis. (R. 185). However, on a form entitled "Claimant's Medications," dated March 19, 2014, Plaintiff reported that he is prescribed Seroquel, cyclobenzaprine, Ultram and a high dose of ibuprofen. (R. 203-04). In addition to these medications, Plaintiff is prescribed glasses/contact lenses. (R. 184).

exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d

802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V.  ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since October 8, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: remote history of hip surgery due to dysplasia of both hips; osteoarthritis of both hips; degenerative disc disease of the lumbar spine; obesity; anxiety; bipolar; mood disorder; marijuana abuse (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. The undersigned finds that the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(a) except work must: entail no climbing of ladders, ropes, or scaffolds, kneeling, or crawling; entail only occasional climbing of ramps or stairs, balancing, stopping, or crouching; avoid concentrated exposure to temperature extremes, vibrations and hazards (moving plant machinery and unprotected heights); and be limited to simple routine unskilled work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on August 30, 1980[,] and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 8, 2012, through the date of this decision (20 CFR 404.1520(g)).

(R. 19-27).

## VI.    DISCUSSION

### A.    Contentions of the Parties

In his Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ: (1) improperly evaluated and weighed the medical opinion of Mr. McCullough; (2) failed to explain upon which evidence he relied and (3) improperly assessed Plaintiff's credibility. (See Pl.'s Br. in Supp. of his Mot. for Summ. J. ("Pl.'s Br.") at 5, 10, 12, ECF No. 11). Plaintiff requests that the Court remand the case for the calculation of benefits or, in the alternative, remand the case for further proceedings. (Pl.'s Mot at 1).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the ALJ: (1) provided adequate reasons for discounting Mr. McCullough's opinion; (2) found in Plaintiff's favor at step two of the sequential evaluation process and (3) reasonably assessed Plaintiff's credibility. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 9, 12-13 ECF No. 13). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

**B.    Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640,

642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

## C. Analysis of the Administrative Law Judge's Decision

### 1. Whether the ALJ Properly Evaluated and Weighed the Opinion of Mr. McCullough

Plaintiff argues that the ALJ improperly assigned little weight the opinion of Mr. McCullough contained in his Psychological Examination. (Pl.'s Br. at 5). Defendant argues that the ALJ provided adequate reasons for discounting Mr. McCullough's opinion and that his decision to assign the opinion little weight is supported by substantial evidence. (Def.'s Br. at 9).

An ALJ must "weigh and evaluate every medical opinion in the record." Monroe v. Comm'r of Soc. Sec., No. 1:14CV48, 2015 WL 4477712, at *7 (N.D. W. Va. July 22, 2015). When weighing and evaluating these opinions, an ALJ often accords "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the claimant and has a treatment relationship with the claimant. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). However, this "treating physician rule . . . does not require that the [treating physician's] testimony be given controlling weight." Anderson v. Comm'r, Soc. Sec., 127 F. App'x. 96, 97 (4th Cir. 2005). Therefore, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence," then it should not be accorded controlling weight. Id. Additionally, if a physician's opinion encroaches on an issue reserved to the Commissioner, including the issue of whether a claimant meets the statutory definition

of disability, then the opinion should not be accorded controlling weight. 20 C.F.R. § 404.1527(d)(3).

When evaluating medical opinions that are not entitled to controlling weight, an ALJ must consider the factors detailed in 20 C.F.R. § 404.1527. 20 C.F.R. § 404.1527. These factors include: (1) whether the physician has examined the claimant; (2) the treatment relationship between the physician and the claimant, including the nature and extent of the treatment relationship; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist and (6) any other factor that tends to support or contradict the opinion. Id. An ALJ, however, need not explicitly "recount the details of th[e] analysis [of these factors] in the written opinion." Fluharty v. Colvin, No. CV 2:14-25655, 2015 WL 5476145, at *12 (S.D. W. Va. Sept. 17, 2015).

While an ALJ need not explicitly recount his or her analysis of the factors listed in 20 C.F.R. § 404.1527, an ALJ must "give 'good reasons' in the [written] decision for the weight ultimately allocated to medical source opinions." Id. (quoting 20 C.F.R. § 404.1527(d)(2)). In this regard, Social Security Ruling 96–2p provides that an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Once an ALJ has determined "the weight to be assigned to a medical opinion[,] [that determination] generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies' or has failed to give a sufficient reason for the weight afforded a particular opinion." Dunn v. Colvin, 607 F. App'x. 264, 267 (4th Cir. 2015)

(internal citations omitted).

In the present case, the ALJ accorded "little weight" to the opinion of Mr. McCullough contained in the Psychological Examination. (R. 24). Initially, the ALJ noted that Mr. McCullough concluded in his Psychological Examination that Plaintiff is unable to work "even in a low stress, low productivity quote job[ ]" because such a job would increase his delusional and hallucinatory symptoms and "most likely le[ad] to a period of significant decompensation." (Id.). The ALJ then declined to accord the opinion controlling weight, noting that Mr. McCullough was not one of Plaintiff's treating physicians. (Id.). Subsequently, the ALJ reasoned that the opinion was entitled to only limited weight because:

> [Plaintiff] underwent a psychological evaluation by Rod McCullough, M.A. . . . It is emphasized that [Plaintiff] underwent the examination that formed the basis of the opinion in question not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal. Although such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored. Additionally, Mr. McCullough reported no more than moderate symptoms upon his examination; therefore his opinions on employability is not supported. . . . While [Plaintiff's] mental health condition would be expected to cause some functional limitations, [Plaintiff's] limited treatment history and only moderate limitations with relation to GAF scores and [ ]mild dysfunction in domains[8] I and II found by his treating mental health providers indicate that these symptoms are not as severe as alleged by [Plaintiff].

(Id.).

The undersigned finds that the ALJ properly evaluated Mr. McCullough's opinion. After deciding not to accord the opinion controlling weight, the ALJ proceeded to

---

[8] Plaintiff contends that the ALJ failed to define the word "domain." (Pl.'s Resp. at 3). However, the domains of functioning are defined in the Social Security Regulations. See 20 C.F.R. § 404.1520a(c)(3). Therefore, the ALJ did not need to specifically define each of the domains when he was referring to them.

consider the five factors listed in 20 C.F.R. § 404.1527. While the ALJ did not explicitly

recount the details of his analysis of the five factors in his written opinion, his

consideration of the factors is obvious by his statements that Mr. McCullough examined

Plaintiff (factor one), the relationship between Mr. McCullough and Plaintiff consisted of

an effort to generate evidence for an appeal and was not a treating physician-patient

relationship (factor two) and the opinion is not supported by the record (factor three).

(Id.). The ALJ also specified instances in which the opinion was inconsistent with the

record (factor four) and noted that Mr. McCullough possesses a Master of Arts degree

and not a doctoral degree (factor five). (See id.). Moreover, the ALJ provided his

reasons for according the opinion little weight, which are sufficiently specific. Therefore,

the ALJ followed proper procedure when according Mr. McCullough's opinion little

weight.

Plaintiff argues that the ALJ erroneously considered the fact that Plaintiff

presented to Mr. McCullough "through attorney referral and in connection with an effort

to generate evidence for the current appeal." (Pl.'s Br. at 6-7). The undersigned

disagrees. When determining how much weight to assign a medical opinion that is not

entitled to controlling weight, an ALJ is required to consider the nature of the

relationship between the opining health care provider and the claimant (factor two). 20

C.F.R. § 404.1527(c)(2). Moreover, when making this statement, the ALJ was noting

that Mr. McCullough was not a treating source whose opinion would be entitled to more

weight. See id.; Nicholson v. Comm'r of Soc. Sec. Admin., 600 F. Supp. 2d 740, 782

(N.D.W. Va. 2009) (stating that, unlike a doctor who is seen for purposes of litigation, a

treating physician is a physician "who provides a [claimant] with medical treatment . . .

and has an ongoing . . . relationship with the [claimant]"). The undersigned also notes that, while the ALJ documented that Plaintiff presented to Mr. McCullough for litigation purposes only and not for treatment, the ALJ did not disregard Mr. McCullough's opinion for this reason. Instead, the ALJ noted that, despite the circumstances surrounding Mr. McCullough's examination of Plaintiff, the evidence obtained during the examination "is certainly legitimate and deserves due consideration." (R. 24). Therefore, Plaintiff's argument lacks merit.[9]

Plaintiff also argues that the ALJ manufactured an inconsistency between Mr. McCullough's opinion and the record by mischaracterizing Mr. McCullough's opinion. (Pl.'s Br. at 9). Specifically, Plaintiff challenges the ALJ's statement that Mr. McCullough "reported no more than moderate symptoms upon his examination," contending that "[n]othing in [the opinion] appears to indicate [only] moderate psychological [symptoms]." (Id.). The undersigned finds that this argument also lacks merit. In his report of the Psychological Examination of Plaintiff, Mr. McCullough documented, *inter alia*, the following non-severe findings that support the ALJ's statement that Plaintiff exhibited no more than moderate symptoms:

> Upon our second meeting on July 11, 2014[, Plaintiff] reported having racing thoughts; mostly at night time. It appears that his prescription of Seroquel does help quite a bit with lowering the incidence of his "racing thoughts" . . . .

---

[9] Plaintiff further argues that, because the ALJ erroneously considered the circumstances surrounding Mr. McCullough's examination of Plaintiff, Plaintiff did not receive a fair review of the evidence and was constructively denied the effective assistance of counsel. (Pl.'s Br. at 7-8). Because the undersigned finds that Plaintiff's primary argument fails because the ALJ did not erroneously consider the circumstances surrounding the examination, Plaintiff's dependent arguments also fail. The undersigned also notes that, while Plaintiff argues that the ALJ did not analyze with "the same intensity . . . the SSA-generated evidence," the ALJ accorded little weight, the same weight assigned to Mr. McCullough's opinion, to the opinions of the state agency physicians. (R. 25-26) (detailing how the ALJ determined that Plaintiff suffers from more significant limitations than what the state agency physicians opined).

During my interactions with [Plaintiff] I noted a moderate degree of suspiciousness. He was not actively hallucinatory on either of the dates I spoke with him. . . . I found him easily derailed [only] at times and he showed a degree of circumstantiality in his responses to this examiner. . . .

There does appear to be a mild to moderate degree of emotional distress with [Plaintiff].

(R. 290-91). Despite Plaintiff's argument, Mr. McCullough did not document any observed severe symptoms during the examination. (See id.). While Mr. McCullough noted that Plaintiff's MCMI-III test results, which were based on Plaintiff's verbal responses, "*suggest*[ ] strong characterological dysfunction," this statement does not refute the ALJ's conclusion that Mr. McCullough did not witness a display of severe symptoms. (R. 291) (emphasis added). Moreover, it is not the role of this Court to reweigh the evidence or substitute its judgment for that of the ALJ's. Therefore, Plaintiff's argument is without merit.

Finally, Plaintiff argues that the ALJ failed to address Plaintiff's schizoaffective disorder "which, in turn, allowed [him] to discount [Mr.] McCullough's opinion as being inconsistent with [Mr.] McCullough's testing," as the testing showed that Plaintiff likely suffers from a schizotypal personality disorder. (Pl.'s Br. at 9). The undersigned disagrees with this argument. The ALJ noted two separate times in his written opinion that Plaintiff had been diagnosed with schizoaffective disorder. (R. 24). However, the ALJ did not include this diagnosis as a severe impairment at step two of the sequential evaluation process, a decision that Plaintiff does not contest. (R. 19) (listing only the impairments that the ALJ determined were severe in nature and not the non-severe impairments). The undersigned also notes that the ALJ did not dispute that Plaintiff suffers from a "mental health condition [that would be expected to cause . . . functional

limitations" but that he disputed the severity of the symptoms caused by that mental health condition. (R. 24). Consequently, Plaintiff's arguments are without merit and the ALJ's decision to accord Mr. McCullough's opinion little weight is supported by substantial evidence.

### 2. Whether the ALJ Adequately Explained his Reasoning

Plaintiff argues that the ALJ "was unclear on which evidence he relied" when determining Plaintiff's RFC. (See Pl.'s Br. at 10-12). While Defendant does not specifically address this argument, Defendant implies that the ALJ's RFC determination is supported by substantial evidence. (See Def.'s Br. at 7-9).

An ALJ's decision need only "contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating [his or her] determination and the reason or reasons upon which it is based." Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). In other words, an ALJ need only "provide a minimal level of analysis that enables [a] reviewing court[ ] to track the ALJ's reasoning." McIntire v. Colvin, No. 3:13-CV-143, 2015 WL 401007, at *5 (N.D. W. Va. Jan. 28, 2015). Therefore, while an ALJ is required to consider all of the relevant evidence submitted by a claimant, the ALJ is "not obligated to comment on every piece of evidence presented." 20 C.F.R. § 416.920; Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015); Reid, 769 F.3d at 865 (stating that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision").

In the present case, the ALJ stated that his RFC determination "is supported by the medical evidence of record." (R. 26). Regarding that evidence, Plaintiff

acknowledges that, when determining Plaintiff's RFC, the ALJ accorded little weight to the opinions of the state agency physicians and Mr. McCullough and relied on Plaintiff's "Global Assessment of Functioning (GAF) scores that range from 25-60 [located] throughout the record." (R. 24-26). Nevertheless, Plaintiff argues that the ALJ erred by failing to indicate the weight he assigned to Dr. Paliwal's medical opinion, referring to the disability examination that Dr. Paliwal performed on January 30, 2013. (Pl.'s Br. at 11). Initially, the undersigned notes that the Dr. Paliwal's disability findings are documented in a treatment note and are not addressed to the Social Security Administration or written on an agency-provided form. While medical opinions may appear in other fashions, Dr. Paliwal does not appear to offer an opinion in his disability findings. While Dr. Paliwal did assess Plaintiff as suffering from low back pain and hip pain, he did not diagnose any specific impairment or state that Plaintiff suffers from any limitations. See 20 C.F.R. § 404.1527(a)(2) (defining "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect *judgments* about the nature and severity of [claimants'] impairment(s), including [their] symptoms, diagnosis and prognosis, what [they] can still do despite impairment(s), and [their] physical or mental restrictions") (emphasis added). Instead, Dr. Paliwal's treatment note appears to simply detail Dr. Paliwal's observations and treatment of Plaintiff.

However, assuming *arguendo* that Dr. Paliwal's disability examination notes constitute a medical opinion, the undersigned finds that any error on the part of the ALJ in failing to explicitly state the weight of the opinion is harmless in nature. In his written opinion, the ALJ discussed Dr. Paliwal's disability examination findings at length:

On January 30, 2013, [Plaintiff] presented to Himanshu Paliwal, M.D.[,] for a consultative examination. [Plaintiff] reported to Dr. Paliwal that he experienced constant pain; however, the pain was not radiating. He reported that his pain symptoms worsened with prolonged standing, sitting, or laying and pain was somewhat relieved with changing position. Dr. Paliwal reported that [Plaintiff] was "comfortable during whole evaluation" and that he was not using any assistive device. Additionally, he was comfortable getting on and off the examination table. On examination, [Plaintiff] had bilateral paraspinal diffu[se] tenderness in the thoracolumbar area; however, leg sensation was normal, gait was normal, and toe and heel walk were also normal. Notabl[y], Dr. Paliwal's examination was unremarkable with normal range of motion in all areas. Dr. Paliwal noted that [Plaintiff] was "normal for age and body." Dr. Paliwal's assessment was low back pain (lumbago) and hip pain. Significantly, x-rays of the lumbar spine revealed no significant bone abnormality.

(R. 22). After discussing Dr. Paliwal's examination findings, the ALJ stated that "the unremarkable examination by Dr. Paliwal . . . indicated that [Plaintiff's] symptoms are not as severe as alleged" and that, therefore, "the [assigned] light [RFC] with postural and environmental limitations [will] adequately accommodate [Plaintiff's] musculoskeletal and obesity conditions." (R. 23).

After reading these statements of the ALJ's, it is clear that the ALJ accorded significant weight to Dr. Paliwal's examination findings. The ALJ also explained why he accorded the findings significant weight, reasoning that the findings were consistent with the record. (Id.) (reasoning that the findings were consistent with Dr. Klein's examination findings). Consequently, because the ALJ plainly accorded Dr. Paliwal's examination findings significant weight and explained his reasoning for doing so, any error on his part in not explicitly stating the assigned weight is harmless error. See Spurlock v. Astrue, No. 3:12-CV-2062, 2013 WL 841474, at *20 (S.D. W. Va. Jan. 28, 2013) R&R adopted sub nom. Spurlock v. Astrue, No. CIV.A. 3:12-2062, 2013 WL 841483 (S.D. W. Va. Mar. 6, 2013) (stating that "an ALJ's failure to explicitly state the weight he gave to a

particular medical opinion constitutes harmless error, so long as the weight given to the opinion is discernible from the decision and any grounds for [counting or] discounting it are reasonably articulated").

Plaintiff further argues that the ALJ improperly relied upon Plaintiff's GAF scores, contending that "[a] GAF needs supporting evidence to be given much weight." (Pl.'s Br. at 11-12). The undersigned initially notes that Plaintiff acknowledges that the ALJ did reference some supporting evidence. Nevertheless, the undersigned finds that the ALJ sufficiently discussed the relevant evidence and his reasons for according Plaintiff's GAF scores great weight. In his written opinion, the ALJ stated that:

> While [Plaintiff's] mental health condition would be expected to cause some functional limitations, [Plaintiff's] limited treatment history and only moderate limitations with relation to GAF scores and [ ]mild dysfunction in domains I and II found by his treating mental health providers indicate that the symptoms are not as severe as alleged by [Plaintiff]. Furthermore, the undersigned finds that the above unskilled [RFC] adequately accommodates [Plaintiff's] mental health condition. . . .

> [Regarding Plaintiff's GAF] scores that range from 25-60 throughout the record[,] . . . the scores [notably] indicate that despite an exacerbation in symptoms, [Plaintiff's] functional abilities have remained at a moderate level with treatment. Additionally, [Plaintiff's] scores were assessed by his treatment mental health providers, whom would have a significant insight into [Plaintiff's] functional abilities. Therefore, the undersigned has given great weight to the GAF scores contained in the longitudinal record.

(R. 24-25). Because the undersigned is able to follow the ALJ's reasoning, the ALJ provided the level of analysis required of him and Plaintiff's argument fails.

Finally, Plaintiff contends that he failed to consider and discuss evidence that contradicted the GAF scores, specifically pointing to Mr. McCullough's finding of severe limitations, evidence of Plaintiff's psychiatric hospitalizations and treatment notes indicating that Plaintiff suffers from extreme dysfunction in "Domain III" and marked

dysfunction in "Domain IV." (Pl.'s Br. at 11-12). Initially, the undersigned notes that an ALJ is not required to discuss every piece of evidence in the record. Nevertheless, the undersigned finds that the ALJ considered the evidence referred to by Plaintiff. In fact, the ALJ specifically refers to the identified evidence in his written opinion, he simply did not credit the evidence. (R. 23-24). Consequently, the ALJ did not err when relying on Plaintiff's GAF scores, in addition to Dr. Paliwal's and Dr. Klein's examination findings and "the medical evidence of record," when determining the RFC and Plaintiff's challenges to the ALJ's RFC reasoning fail. (R. 26).

### 3. Whether the ALJ Properly Assessed Plaintiff's Credibility

Plaintiff argues that the ALJ erred in determining that he is not entirely credible regarding the intensity, persistence and limiting effects of his symptoms. (Pl.'s Br. at 12). Defendant argues that the ALJ properly assessed Plaintiff's credibility and that the credibility determination is supported by substantial evidence. (Def.'s Br. at 13).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1) (2011); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. Id.

Social Security Ruling 96-7p sets out several factors for an ALJ to use when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1.      The individual's daily activities;

2.      The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.      Factors that precipitate and aggravate the symptoms;

4.      The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.      Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.      Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7.      Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility

determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not entirely credible." (R. 22). Initially, the ALJ determined that Plaintiff had proved that he suffers from medical impairments capable of causing "some of the alleged symptoms." (Id.). Then, after examining the factors outlined in SSR 96-7p, the ALJ further determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" in light of the entire record. (Id.).

### i. Plaintiff's Daily Activities

The ALJ considered Plaintiff's daily activities (factor one) when making his credibility determination, noting that Plaintiff "engage[s] in significant daily activities." (R. 25). Specifically, the ALJ noted that Plaintiff performs his own personal care, washes laundry, sweeps floors and wipes countertops. (Id.). The ALJ also noted that Plaintiff is able to travel without accompaniment, operate a motor vehicle and perform hobbies such as reading and taking photographs. (Id.). Finally, the ALJ noted that Plaintiff occasionally prepares meals for himself, goes shopping and to the library on a regular basis and talks with others in front of a campfire weekly. (Id.). After noting these activities, the ALJ stated that these "activities . . . are not consistent with a totally disabled individual"[10] and "detract from [Plaintiff's] credibility concerning the severity of

---

[10] Plaintiff argues that the ALJ "created an arbitrary standard of disability by requiring [Plaintiff] to prove that he was [totally disabled]." (Pl.'s Br. at 12-13). However, the ALJ did not require Plaintiff to be totally disabled. Instead, the ALJ noted that Plaintiff claims to suffer from totally disabling symptoms and discussed how the evidence did not support those claims, which

his symptoms." (<u>Id.</u>).

### ii.   Plaintiff's Pain and Other Symptoms

The ALJ also reviewed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two) and the factors that precipitate and aggravate those symptoms (factor three). Regarding Plaintiff's symptoms, which the ALJ discussed at length, the ALJ noted that Plaintiff complains of, *inter alia*, lower back pain, hip pain, depression, anxiety and hallucinations. (R. 21-22). After noting Plaintiff's symptoms, the ALJ declared that Dr. Paliwal and Dr. Klein documented that Plaintiff displayed few abnormal symptoms in their examinations of him and that Plaintiff's "own treating mental health providers reported mild dysfunction or moderate symptoms," leading him to believe that Plaintiff's "symptoms are not as severe as alleged." (R. 23-25). Regarding factors that precipitate/aggravate Plaintiff's symptoms, the ALJ documented that Plaintiff's pain "worsen[s] with prolonged standing, sitting[ ] or laying." (R. 22).

### iii.   Plaintiff's Medications

The ALJ generally discussed the medication that Plaintiff is prescribed for his symptoms (factor four). Regarding the medication for his physical impairments, the ALJ noted that Plaintiff is not prescribed any medication but takes only over-the-counter medicine. (R. 21, 24). Regarding the medication for his mental impairments, the ALJ noted that Plaintiff was "provided with intensive psychotropic medication adjustment" when he was hospitalized in November of 2013. The ALJ further noted that, in July of 2014, Plaintiff's psychotropic medication "was helping." (R. 23-24).

---

is proper for a credibility assessment. (See R. 21-26).

### iv. Other Treatment and Measures Used to Relieve Symptoms

Next, the ALJ reviewed treatment other than medication that Plaintiff has received for relief of his symptoms (factor five), as well as measures Plaintiff uses to relieve his symptoms on his own (factor six). Regarding treatment other than medication that Plaintiff has received for his symptoms, the ALJ documented that Plaintiff's treatment history is limited. (R. 24). Specifically, the ALJ documented that Plaintiff has sought only conservative treatment and "has also not proceeded with surgical hip intervention." (Id.). The ALJ further documented that Plaintiff did not seek specialized treatment for his mental health condition until November of 2013, "more than a year after his alleged onset date." (Id.). Finally the ALJ documented that Plaintiff participates in therapy at the Community Mental Health Center. (R. 23). After noting Plaintiff's treatment history, the ALJ concluded that it "fails to demonstrate a condition of the degree of severity for which [Plaintiff] has alleged." (R. 24). As for measures Plaintiff uses to relieve his symptoms on his own, the ALJ noted that Plaintiff smokes marijuana to help with his depressive symptoms. (R. 22).

### v. GAF Scores

An additional factor (factor seven) that the ALJ considered when assessing Plaintiff's credibility is his GAF scores. Specifically, the ALJ noted that Plaintiff's GAF scores represent "only moderate limitations" that "indicate that [his] symptoms are not as severe as alleged." (R. 24).

### vi. Plaintiff's Work History

Another factor (factor seven) that the ALJ considered when assessing Plaintiff's credibility is his work history. Specifically, the ALJ noted that:

> Overall, [Plaintiff] has demonstrated little apparent motivation, inclination[ ] or need to sustain consistent employment. Indeed, only four years of earnings reported in his earnings record . . . are reflective of substantial gainful activity levels of employment. Overall, [Plaintiff's] work history raises some questions as to whether the current employment is due to his medical conditions

(R. 25). The ALJ then stated that Plaintiff's "work history . . . undermines [his] credibility." (Id.).

Plaintiff argues that, by considering Plaintiff's work history and motivation to work, the ALJ "arbitrarily creat[ed] his own factor in analyzing [Plaintiff's] credibility" and thus "act[ed] outside the scope of SSR 96-7p." (Pl.'s Br. at 14-15). The undersigned disagrees. SSR 96-7p does not limit what an ALJ may consider when assessing a claimant's credibility. SSR 96-7p, 1996 WL 374186, at *3. To the contrary, in addition to the identified six factors, SSR 96-7p authorizes an ALJ to consider "[a]ny other factor" (factor seven) that is relevant to credibility. Id. Moreover, courts have regularly upheld an ALJ's consideration of a claimant's work history in a credibility assessment. See, e.g., Campbell v. Astrue, 465 F. App'x. 4, 7 (2d Cir. 2012) (defining "other factors" as including a claimant's relevant work history); Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (upholding a credibility assessment in which the ALJ stated that the claimant's "sporadic" work history "indicates that he was not strongly motivated to engage in meaningful productive activity even prior to the alleged onset of disability"); Davis v. Astrue, No. 2:10CV30, 2011 WL 399956, at *33 (N.D.W. Va. Jan. 11, 2011), R&R adopted sub nom. Davis v. Comm'r of Soc. Sec., No. 2:10-CV-30, 2011 WL 442118 (N.D. W. Va. Feb. 2, 2011) (upholding a credibility assessment in which the ALJ considered the claimant's work history and stated that "[t]he fact that the claimant ceased working for reasons unrelated to the impairment does not add [to] credibility").

Therefore, Plaintiff's argument is without merit.

### vii. Substantial Evidence Supports the ALJ's Credibility Determination

After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear his reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned accords the ALJ's credibility determination the great weight to which it is entitled.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for DIB is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 12) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94

(4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841, 845-48 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 22nd day of September, 2016.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE